UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS  DIVISION

THE FINISH LINE, INC.,                        )
         Plaintiff,                         )
                                )
    vs.                                          )          1:04-cv-877-RLY-WTL
                                )
FOOT LOCKER, INC.,                           )
         Defendant.                        )

**ENTRY ON FOOT LOCKER'S MOTION FOR SUMMARY JUDGMENT and
MOTION FOR ORAL ARGUMENT
(Filed under seal)**

On May 20, 2004, Plaintiff, Finish Line, Inc. ("Finish Line"), filed a three-count

Complaint against Foot Locker, Inc. ("Foot Locker").  In Counts I and II, Plaintiff

alleges claims for tortious interference and unfair competition, and in Count III, Finish

Line alleges a claim for theft of trade secrets under the Indiana Uniform Trade Secrets

Act.  Foot Locker now moves for summary judgment.  For the reasons set forth below,

the court **GRANTS** its motion.  Foot Locker's request for oral argument is **DENIED** as

**MOOT**.

**I.**      **Summary Judgment Standard**

A party is entitled to summary judgment "if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there

is no genuine issue of material fact and that the moving party is entitled to a judgment as

a matter of law."  Fed. R. Civ. P. 56(c).  In considering a motion for summary judgment,

a court must draw all reasonable inferences in the light most favorable to the non-movant. *See Spraying Sys. Co. v. Delavan, Inc*., 975 F.2d 387, 392 (7th Cir. 1992).  The court's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.  *See Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir.2003).

In determining whether a genuine issue of material fact exists, the court must view the record and all reasonable inferences in the light most favorable to the non-moving party. *Heft v. Moore*, 351 F.3d 278, 283 (7th Cir. 2003).  The moving party bears the burden of demonstrating the "absence of evidence on an essential element of the non-moving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  The non-moving party may not, however, simply rest on the pleadings, but must demonstrate by specific factual allegations that a genuine issue of material fact exists for trial. *Green v. Whiteco Industries, Inc.*,  17 F.3d 199, 201 (7th Cir. 1994) (citing *Celotex*, 477 U.S. at 322).

## II.    Factual Background

### A.    Finish Line's Recruiting Efforts

1.    Foot Locker and Finish Line are competitors in the retail athletic shoe business and operate retail stores in many of the same malls throughout the country. (Defendant's Ex. A, ¶¶ 5, 12).

2.    Having talented personnel to operate, oversee and manage their stores is critical to both Foot Locker's and Finish Line's businesses.  In order to hire the qualified

employees they need, both Finish Line and Foot Locker utilize a variety of recruiting techniques.  (Defendant's Ex. B at 201-02; Defendant's Ex. C at 14-16, 22-23).  One such technique is known as "direct recruiting."  (Defendant's Ex. B at 180; Defendant's Ex. D; Defendant's Ex. E at 5, 33).

3.    Finish Line's training module on "direct recruiting" describes the practice as "the surgical removal of top talent from other organizations and . . . transplanting them into our company."  (Defendant's Ex. B at 182, 184; Defendant's Ex. D at FL 0000115).  The module states that the "best place to look for people [to directly recruit] is in stores that are similar to [Finish Line's]" including "other athletic shoe retailers."  (Defendant's Ex. B at 188; Defendant's Ex. D at FL 0000117).  According to Finish Line, "dollar for dollar," "direct recruiting" "is one of the most cost-effective ways to hire top performers."  (Defendant's Ex. B at 186; Defendant's Ex. D at FL 0000115).

4.    Over the past several years, Finish Line has recruited many of Foot Locker's talented employees.  (Defendant's Ex. B at 167; Defendant's Ex. F at 74-75).  Since 2003 alone, Finish Line has directly recruited over 135 of Foot Locker's employees, and at least twenty-five percent of Finish Line's current district management team is comprised of employees who formerly worked for Foot Locker.  (Defendant's Ex. B at 35, 166-67; Defendant's Ex. G at Response No. 2).

5.    In order to hire some of Foot Locker's employees, Finish Line agreed to pay them above Finish Line's normal pay scale.  (Defendant's Ex. E at 40-41, 47-49;

Defendant's Ex. H).

**B.**    **Foot Locker's Recruiting Efforts in 2003**

6.    In 2003, Foot Locker found that its "bench strength" was weak.  In other words, Foot Locker did not have a sufficient number of qualified employees to promote into district and regional management positions as they became open. (Defendant's Ex. C at 62-64, 151-52).

7.    In the fall of 2003, Foot Locker contacted a number of Finish Line employees to discuss employment opportunities with Foot Locker.  (Defendant's Ex. C at 52-53; Defendant's Ex. F at 5, 30, 48-49).  None of these Finish Line employees were bound by covenants not to compete, and all were employed by Finish Line "at-will."  (Defendant's Ex. I at 24-25).

8.    Nancy Gedbaw, then Foot Locker's Director of Field Recruiting and Training, created a list of the names and telephone numbers of Finish Line's district managers so that Foot Locker employees could contact them regarding employment with Foot Locker.  (Defendant's Ex. F at 7, 33-34, 56; Defendant's Ex. J).  Ms. Gedbaw gathered the information from Foot Locker personnel, who are typically acquainted with the identity of Finish Line's store and district managers.  (Defendant's Ex. B at 36-37; Defendant's Ex. C at 43-46; Defendant's Ex. F at 33, 56).  The list showed the district managers' names and telephone numbers, the geographic region in which they worked, whether they previously worked for Foot Locker, and if so, whether Foot Locker considered them to be re-

4

hireable.  (Defendant's Ex. F at 33, 35-36; Defendant's Ex. J).

9.  After the list was mostly complete, an unidentified Finish Line store associate provided the list of Finish Line district managers and their contact information to Saul Mejia, who was then Foot Locker's Human Resources Director for its Western Region.  (Defendant's Ex. C at 15, 43-46; Defendant's Ex. F at 34-35).  Although Finish Line marks many of its documents as "confidential," the list had no such marking.  (Defendant's Ex. B at 230-31; Defendant's Ex. K at Response No. 3; Defendant's Ex. L).  Indeed, many of Finish Line's district managers are listed in public directories.  (Defendant's Ex. B at 43).

10.  National Graphics, an outside marketing vendor for Finish Line, is included on the distribution list.  (Defendant's Ex. B at 230-31, 236; Defendant's Ex. L).

11.  Although Foot Locker contacted a number of Finish Line employees in the fall of 2003, no such employees terminated their employment with Finish Line as a result.  (Defendant's Ex. B at 140, 156; Defendant's Ex. K at Response No. 1).  Over the following months, Foot Locker postponed its special recruiting effort "to focus on the [upcoming] holiday season."  (Defendant's Ex. C at 71-72).

**C.    Foot Locker's Recruiting Efforts in the Spring of 2004 Following Its Acquisition of Footaction**

12.  In April 2004, Foot Locker acquired 350 stores from its then bankrupt competitor, Footaction.  (Defendant's Ex. C at 122-23; Defendant's Ex. F at 42-43).

13.  A number of the Footaction stores were already understaffed when Foot Locker

acquired them, and Foot Locker did not offer positions to all of Footaction's employees. (Defendant's Ex. C at 123-24; Defendant's Ex. F at 45; Defendant's Ex. N at 62-63; Defendant's Ex. O at 76-77). Also, within a month of the acquisition, a number of the Footaction employees Foot Locker did hire either resigned or were terminated. (Defendant's Ex. O at 76-77). After the acquisition, Foot Locker had to fill many open store level positions, including store manager and district manager positions. (Defendant's Ex. C at 125; Defendant's Ex. F at 46; Defendant's Ex. O at 7, 13, 39-40, 74-75; Defendant's Ex. P at 10, 95-96, 114-15).

14.    Foot Locker stepped-up its recruiting efforts in May 2004. As part of that effort, Ms. Gedbaw created a document titled the "Finish Line Action Plan," which she attached to an e-mail she sent to Foot Locker's regional HR Directors, among others. (Defendant's Ex. F at 58-59; Defendant's Ex. R). The Action Plan stated, in pertinent part:

> Objective: Communicate with every store and [district manager] in Finish Line in search of the best talent to bring to Foot Locker. Interview and hire the best people to fulfill current [open-to-hire positions] and upgrade staff. This is an aggressive but DISCREET operation that must be completed swiftly and professionally.
>
> [District Managers and], HR Directors must work with RVP and Operations Team on placing new candidates as soon as possible. FIND positions for the qualified candidates, doubling up in Locker stores if necessary and with Operations on pay exceptions. Work to fill the [open-to-hire positions] first, but bring in ANY talent that is discovered.

6

(Defendant's Ex. R at FTL 00007).  The e-mail to which the Action Plan was attached stated that the Plan "will only help fulfill the [open-to-hire positions] we currently have as well as hit the competition where it hurts."  (Defendant's Ex. R at FTL 00006).

15.    Pursuant to the Action Plan, Foot Locker's district managers and store managers were to visit Finish Line's stores and determine whether any Finish Line employees would be good candidates for employment with Foot Locker. (Defendant's Ex. F at 30; Defendant's Ex. R).  Foot Locker's Regional HR Directors were to contact certain Finish Line district managers, using the list Ms. Gedbaw had created the prior year, and advise them of Foot Locker's acquisition of Footaction and the resulting employment opportunities with Foot Locker. (Defendant's Ex. F at 79-80; Defendant's Ex. R; Defendant's Ex. S).  Foot Locker's managers and HR Directors were to set up interviews with any Finish Line employees interested in working for Foot Locker.  (*Id*.).

16.    Attached to the Action Plan was a list of interview questions, which Foot Locker employees were to use in interviewing Finish Line personnel.  Question two stated:

2.    Tell me about your district's results in the past two years:

Sales and sales gains
Shrink results
Wage and hour control
Anything else you think is pertinent

(Defendant's Ex. F at 64-66; Defendant's Ex. R at FTL 00011).

17. On May 12, 2004, Foot Locker's Southeast HR Director, Elizabeth Shirk, telephoned six Finish Line district managers and ultimately spoke with four of them. (Defendant's Ex. P at 76-79). The district managers were selected by Ms. Gedbaw, then Ms. Shirk's supervisor, based on their geographic locations and the locations where Foot Locker had to fill open district manager positions or where it anticipated such positions opening over the following year. (Defendant's Ex. F at 67-68; Defendant's Ex. P at 77-78; Defendant's Ex. U).

18. Following a script provided by Ms. Gedbaw, Ms. Shirk advised each of the district managers she contacted that Foot Locker had acquired Footaction and that the acquisition had created new employment opportunities with Foot Locker. (Defendant's Ex. P at 77-79, 89-91, 97-04); Defendant's Ex. V at 17-18; Defendant's Ex. W at 18; Defendant's Ex. X at 45, 47-48). All of these district managers told Ms. Shirk they were not interested and declined interviews. (Defendant's Ex. P at 80, 89-90, 99-102; Defendant's Ex. W at 20-21; Defendant's Ex. X at 48-49).

19. Ms. Shirk did not solicit or receive any Finish Line business information from any of the district managers she contacted. (Defendant's Ex. P at 80, 99-100, 109-10; Defendant's Ex. V at 31-33; Defendant's Ex. W at 22-24; Defendant's Ex. X at 49-50). In fact, Finish Line cannot identify a single district manager that was solicited by Foot Locker to disclose confidential business information.

8

(Defendant's Ex. B at 107-08).

20.    During the course of Mr. Mejia's interviews with Finish Line personnel, however, he did ask at least one manager for information regarding his store's shrink and inventory.  (Plaintiff's Ex. 3 at 97-99).  He did not share this information with any one else in the Foot Locker organization.  (*Id*. at 98).

21.    No Finish Line employees terminated their employment as a result of Foot Locker's May 2004 recruiting effort.  (Defendant's Ex. K at Response No. 1; Defendant's Ex. M at ¶¶ 3-6; Defendant's Ex. B at 140, 156).  The only alleged harm Finish Line claims is that some Finish Line employees "were somehow distracted [by Foot Locker's recruiting effort] for a period of time in the spring of 2004."  (*Id*. at 150).  Finish Line, however, does not identify a single employee whose work was impaired as a result of Foot Locker's contacts.  (*Id*. at 150-51, 155-56).  Also, Finish Line concedes that if Foot Locker's recruiting efforts continued, there was only an "outside possibility" that some Finish Line employees would terminate their employment with Finish Line.  (*Id*. at 143).

   **D.    Finish Line Learns of the Action Plan, and Foot Locker Revises its Questionnaire**

22.    Finish Line became aware of the Action Plan from an anonymous source. (Affidavit of Gregg Davis, ¶ 13).

23.    Finish Line filed its Complaint in this matter on May 20, 2004.

24.    On May 28, 2004, Foot Locker human resources personnel were told the Action

Plan was being suspended.  (Plaintiff's Ex. 3 at 36-40).

25.    On June 22, 2004, Scott Behrends, Director of Field Recruiting and Training for Foot Locker, sent an e-mail revising the previous questionnaire.  (Plaintiff's Ex. 13).

26.    The interview questions asking the Finish Line managers to disclose their districts' sales and sales gains, shrink results, and wage and hour controls were eliminated. (*Id*. at FTL 40-41).  Specific references to Finish Line were also eliminated.  (*Id*.).

**E.    Foot Locker's Requests for Finish Line Business Information**

27.    In 2003 and 2004, approximately five Finish Line store managers were asked questions about their stores' particular business. (Defendant's Ex. Y at Response No. 1).  They do not claim to have been coerced, threatened or otherwise induced to provide information.  (Defendant's Ex. B at 134, 262-25; Defendant's Ex. Z at 19-20).  The questions asked are summarized below:

(a)    Shawn Bair, a Finish Line store manager in Bellingham, Washington, says that the manager of a Foot Locker store in the small mall asked him and a Finish Line manager-in-training "how the store was doing fiscally," "how much [the manager] made in relation to the volume of the store . . . [and] what the store was up or down on the year."  (Defendant's Ex. AA at 42-44).

(b)    Derek Juliana, a Finish Line store manager in New Jersey, claims a Foot Locker employee asked him "what was the plan for the store, like how much volume [it] was expected to do."  (Defendant's Ex. BB at 40-42).

(c)    Jared Haslam claims that when he was an assistant manager, on three occasions, a Foot Locker assistant store manager asked him and the manager of his store, what their "sales had been on the week."

10

(Defendant's Ex. CC at 28-30, 34).

    (d)    Ty Peteranetz, a Finish Line store manager in Cheyenne, Wyoming, claims that a Foot Locker store manager asked what Mr. Peteranetz "expected to do for that fiscal year." (Defendant's Ex. Z at 19-20).

    (e)    Anthony Clark, a Finish Line store manager in Kentucky, claims he visited a Foot Locker store in the mall where he worked and was approached by a Foot Locker district manager who asked how Finish Line's "bonuses work" and "how do you control your labor."

(Defendant's Ex. DD at 21-23).

28.    Neither Mr. Bair, Mr. Juliana, Mr. Haslam, Mr. Peteranetz, nor Mr. Clark answered the questions they claimed they were asked, nor disclosed any Finish Line business information. (Defendant's Ex. AA at 44, 46; Defendant's Ex. BB at 40-41; Defendant's Ex. CC at 28-30; Defendant's Ex. DD at 25-27, 33; Defendant's Ex. Z at 19-20).

### F.    A Former Finish Line Employee Supplies Foot Locker with Information

29.    In May 2001, at a time totally unrelated to any special recruiting efforts by Foot Locker, and approximately three years before Finish Line filed its initial Complaint, Lonell Morrison, then a buyer of men's branded apparel for Finish Line, interviewed for a job with a division of Foot Locker known as Champs Sports. (Defendant's Ex. GG at 9, 44, 80, 83).

30.    Mr. Morrison was not directly recruited by Champs. Rather, he was introduced to Champs, and several other companies, by a head hunter. (*Id*. at 83-85).

31.    Mr. Morrison claims that during an interview, Richard Mina, then Champs'

President, asked: "if [he] came on board, . . . was there anything that [he] could bring with [him]." (*Id*. at 91-92). Neither Mr. Mina, nor anyone else at the interview, asked Mr. Morrison any questions about Finish Line inventory, sales or business plans. (*Id*. at 88-90, 95).

32.   Following the interview, Mr. Morrison was offered and accepted employment with Champs. (*Id*. at 98-99). Mr. Morrison claims that a week or two after he began working, he met alone with Mr. Mina and brought three documents to the meeting. (*Id*. at 122-24, 127). The first document Mr. Morrison allegedly brought to the meeting was a Finish Line "rolling operating forecast" (or "ROF") which showed "a reprojection of [Finish Line's] business [as it relates to inventory positions] on an ongoing basis." (*Id*. at 68, 111-12). The document did not contain any information about particular products or brands, or sales information on a store, district or regional level. (*Id*. at 113-14). The third document was a "Nike Seasonal Brief" which showed Nike's product suggestions for the upcoming season. (*Id*. at 112-13).

33.   None of the documents Mr. Morrison claims he brought to the meeting were marked "CONFIDENTIAL" and none are stored by Finish Line under lock. (Defendant's Ex. HH at 14; Defendant's Ex. II at 35-37).

34.   The only comments Mr. Morrison claims Mr. Mina made with respect to the documents were questions about Finish Line's accounting system. (Defendant's Ex. GG at 130). Mr. Morrison claims he left the ROF report for a short period

with Mr. Mina, who then returned it to Mr. Morrison. (*Id.* at 130).

35. Mr. Morrison does not claim that Mr. Mina asked for additional documents or information relating to Finish Line's business. (*Id.* at 130-31).

36. Finish Line does not claim that Foot Locker used any of the information Mr. Morrison claims to have provided to Mr. Mina, and concedes that it cannot quantify the damages, if any, to its business. (Defendant's Ex. B at 140, 160, 263-64; Defendant's Ex. K at Response No. 4; Defendant's Ex. HH at 53-54). Indeed, Finish Line acknowledges that Foot Locker could not, using the ROF report, determine the mark-up on any particular products or brands, or determine which products or brands Finish Line intends to sell or the locations in which it intends to do business. (Defendant's Ex. HH at 5, 22, 24-26, 40, 44-45, 47, 49-50; Defendant's Ex. JJ; Defendant's Ex. KK).

## III. Discussion

### A. Tortious Interference Claim

Count I of the First Amended Complaint alleges that Foot Locker tortiously interfered with the relationship between Finish Line and its employees. To succeed on its claims, Finish Line must prove: (1) an advantageous business relationship between Finish Line and its employees; (2) Foot Locker's knowledge of the relationships; (3) Foot Locker's intentional interference with such relationships; (4) the absence of justification; and (5) damages. *Rice v. Hulsey*, 829 N.E.2d 87, 91 (Ind.Ct.App. 2005); *Furno v. Citizens Ins. Co. of Am.*, 590 N.E.2d 1137, 1140 (Ind. Ct. App. 1992). Where, as here,

the alleged business relationship is not contractual, Indiana law requires Finish Line to prove that Foot Locker acted "illegally in achieving its end." *Syndicate Sales, Inc. v. Hampshire Paper Corp*., 2000 WL 1428665, at *18 (S.D. Ind. August 30, 2000) (citing *Biggs v. Marsh*, 446 N.E.2d 977, 983 (Ind.Ct.App.1983)).

Here, Foot Locker contends that Finish Line's tortious interference claim should be dismissed because Finish Line cannot establish, as a matter of law, that (1) Foot Locker's alleged recruiting efforts were unjustified; (2) Foot Locker engaged in illegal conduct; or (3) Finish Line suffered or will suffer any harm as a result.

### 1.    Justification

Generally, a competitor may solicit another's at-will employees. *See Speakers of Sport, Inc. v. ProServe, Inc.*, 178 F.3d 862, 865 (7th Cir. 1999) ("Competition is not a tort. . ."); *see also Flexicorps, Inc. v. Trend Techs., Inc.*, 2002 WL 31018353 (N.D. Ill. Sept. 10, 2002). However, a competitor's actions are without justification if (a) the competitor employs wrongful means; (b) the conduct creates an illegal restraint of trade; or (c) the purpose of the alleged conduct is not, at least in part, to advance the actor's interest in competing with one another. *Rice*, 829 N.E.2d at 91.

Finish Line contends Foot Locker's actions were unjustified because Foot Locker had no legitimate need for the employees it sought to hire. Finish Line admits, however, the following facts:

- In the fall of 2003, Foot Locker's "bench strength" was weak and it did not have a sufficient number of qualified employees to fill management positions as they opened;

- In April 2004, Foot Locker acquired 350 new stores from its then bankrupt competitor, Footaction;

- A number of the Footaction stores were already understaffed when Foot Locker acquired them and Foot Locker did not offer positions to all of Footaction's employees.  Also, within a month of the acquisition, a number of the Footaction employees Foot Locker did hire either resigned or were terminated.

- The documents outlining Foot Locker's May 2004 hiring plan state that the plan was designed to fill open positions that needed to be filled quickly; and

- The Finish Line district managers Foot Locker contacted in May 2004 were selected by Foot Locker based on their geographic locations and the locations where Foot Locker had open positions to fill.

(Facts, ¶¶ 6, 12, 13, 14, 16).

Finish Line also argues that the Action Plan was not designed to fill open positions because the documents outlining the plan authorized personnel to "doubl[e] up in [Foot] Locker stores if necessary."  (Response Brief at 13).  However, it is undisputed that when Foot Locker hires new store-level managers from outside the company, it is standard practice to "double up" managers in a store for several months in order to train the new manager.  (Defendant's Ex. O at 77-79).

Finish Line also argues that there could be no legitimate purpose behind Foot Locker's recruiting efforts because "Foot Locker  was willing to pay employees it did not need more than the normal pay scale allows."  (Response Brief at 14).  Case law holds, however, that companies are free to offer higher salaries to their competitor's at-will employees.  *See Tad, Inc. v. Siebert*, 380 N.E.2d 963, 967 (Ill.Ct.App. 1978).  Indeed,

15

Finish Line itself engages in the exact same type of conduct and offers wages above its normal pay scale to entice Foot Locker employees to leave Foot Locker and work for Finish Line.  (Facts, ¶ 5).

Finally, the fact that Foot Locker revised its interview questions and made a business decision to temporarily suspend the Action Plan after Finish Line commenced this action does not raise issues of fact as to whether the plan was lawful in the first place and does not raise issues of fact concerning Foot Locker's justification.  *See R.M. Perlman, Inc. v. New York Coat, Suit, Dresses, Rainwear & Allied Workers' Union Local, 89-22-1, I.L.G.W.U., AFL-CIO*, 33 F.3d 145, 156 (2d Cir. 1999) (rejecting plaintiff's claim that "suggested revisions to [contract provisions] constitutes evidence that the original clause was unlawful").

### 2.    Illegal Activity

Non-criminal illegal predicate acts, such as a violation of a civil statute, may be sufficient to support a tortious interference claim.  *Syndicate Sales*, 2000 WL 148665 at *18 (citing *Syndicate Sales, Inc. v. Hampshire Paper Corp.*, 192 F.3d 633, 641 (7th Cir. 1999)).  Finish Line contends Foot Locker engaged in the following predicate acts: (1) Mr. Mejia's receipt of Finish Line's district manager list; and (2) the creation of interview questions that ask about a candidate's "results" with regard to "sales" and "shrink."

First, the list of district managers allegedly obtained by Mr. Mejia is not a trade secret as a matter of law, as it simply consisted of a list of names, addresses, and telephone numbers.  *See CNA Fin. Corp. v. Local 743 of Int'l Brotherhood of Teamsters,*

16

*Chauffers, Warehousemen and Helpers of Am.*, 515 F.Supp. 942, 946 (N.D. Ill. 1981). *See also* Section III.D.1. of this opinion.

Second, although Mr. Mejia did ask one Finish Line employee seeking a managerial position with Foot Locker to discuss his "results" with respect to "sales" and "shrink," Mr. Mejia did not share this information with anyone from the Foot Locker organization. (Fact, ¶ 20). Further, the questions were revised to clear any inference to Foot Locker that could be construed to be a request for confidential information. (Defendant's Ex. R at FTL 00011-13).

Finish Line is unable to show that Foot Locker's actions in recruiting Finish Line personnel were unjustified. Accordingly, the court must **GRANT** Foot Locker's motion for summary judgment with respect to Finish Line's tortious interference claim.

### B.     Unfair Competition

Count II of the First Amended Complaint alleges unfair competition. In Indiana, unfair competition extends to acts that "although . . . generally considered a fair and welcomed part of vibrant competition, [are engaged in] for the primary purpose of destroying a competing business." *Bartholomew County Beverage Co., Inc. v. Barco Beverage Corp., Inc.*, 524 N.E.2d 353, 358 (Ind. App. 1988) (holding that Indiana's common law tort of unfair competition is broad enough to extend to predatory price cutting).

To the extent that employee raiding is the type of conduct covered by the tort of unfair competition, there is no evidence that Foot Locker "raided" Finish Line's

17

employees.  Indeed, Finish Line has offered no evidence to refute the testimony of Foot Locker's recruiting personnel that the Action Plan at issue was designed to find talented employees to fill the many open positions Foot Locker had in the spring of 2004. Moreover, Finish Line concedes that each of the employees Foot Locker sought to hire were employed by Finish Line at-will, and had no restrictive convenants whatsoever with Finish Line.  (Facts, ¶ 7).

Finally, Finish Line cites no authority to support its contention that Foot Locker's hiring plan can be rendered unlawful merely by virtue of offhand statements that in addition to filling open positions, the plan would "hit the competition where it hurts" or "destroy" Finish Line's business.  Such offhand remarks, made in the heat of competition, are insufficient to support a prima facie case.  *See Nat'l Parcel Servs., Inc. v. J.B. Hunt Logistics, Inc.*, 150 F.3d 970, 971 (8th Cir. 1998) ("[T]he passing remark by [defendant] that it could 'take you out' is not the kind of competitive threat that will support a prima facie case of tortious interference.").  For these reasons, the court **GRANTS** Foot Locker's motion for summary judgment with respect to Finish Line's unfair competition claim.

### C.    Attorney's Fees and Injunctive Relief

Finish Line also seeks a permanent injunction in relation to its claims for tortious interference and unfair competition.  Foot Locker responds that Finish Line's request must be denied as it concedes it has no monetary damages other than for attorneys' fees. In Indiana, "[a]ttorney fees are not allowable in the absence of a statute, or in the absence

of some agreement or stipulation specifically authorizing" them. *Kikkert v. Krumm*, 474 N.E.2d 503, 505 (Ind. 1985); *see also* Ind. Code § 34-52-1-1 (2005). The only exception is where a party has litigated its claim or defense in bad faith. *See Kikkert*, 474 N.E.2d at 505; Ind. Code § 34-52-1-1. Here, Finish Line has not identified a statute or stipulation authorizing legal fees in connection with its common law claims nor claim that Foot Locker has defended this action in bad faith.

Finish Line's request for a permanent injunction must also be denied because the injury it alleges – raiding of its employees – is not supported by competent evidence. Indeed, Finish Line concedes that Foot Locker's hiring efforts in the fall of 2003 and the spring of 2004 did not result in a single employee leaving Finish Line to work for Foot Locker. (*See* Facts, ¶¶ 11, 18). Moreover, Finish Line's own witness testified that if Foot Locker's alleged hiring practices would continue, there is only a mere "outside possibility" that "some" employees would leave Finish Line. (Fact, ¶ 21). Such a mere possibility of harm is insufficient to support a permanent injunction. Finish Line's request for injunctive relief is therefore **DENIED**.

### D.    Trade Secret Claim

Count III of the First Amended Complaint alleges that Foot Locker has violated the Uniform Trade Secrets Act, Ind. Code § 24-2-3-1 *et seq*. ("IUTSA"). The determination of what constitutes a trade secret is for the court to decide as a matter of law. *Primecare Home Health v. Angels of Mercy Home Health Care, LLC*, 824 N.E.2d 376, 381 (Ind.Ct.App. 2005). "A protectable trade secret has four characteristics: (1)

19

information, (2) which derives independent economic value, (3) is not generally known or readily accessible by proper means by other persons who can obtain economic value from its use, and (4) is the subject of efforts reasonable under the circumstances to maintain its secrecy." *Id.*

"Misappropriation" is defined, in pertinent part, as "acquisition of a trade secret by a person who knows or has reason to know that the trade secret was acquired by improper means." Ind. Code § 24-2-3-2. Under the IUTSA, "improper means" includes "theft, bribery, misrepresentation, breach or inducement of a breach of fiduciary duty to maintain secrecy, or espionage through electronic or other means." Ind. Code § 24-2-3-2.

The alleged trade secrets Finish Line claims Foot Locker allegedly misappropriated are: (1) the district manager contact list allegedly obtained by Mr. Mejia; and (2) the ROF allegedly obtained almost five years ago.

### 1.    List of Finish Line District Managers

In *CNA Fin. Corp. v. Local 743 of Int'l Bhd. of Teamsters*, the court found that a "list composed of [plaintiff's] 'employees' names [and] their home address" did not constitute a trade secret. 515 F.Supp. at 946. The court reasoned that "[w]hile it is conceivable that an employee list may contain such extensive and detailed information that would so devastate a company if disclosed to the wrong person that it could be characterized as a trade secret, this does not appear to be such a case." *Id.* Like the list in *CNA*, the list at issue contains nothing more than the district managers' names, addresses and telephone numbers. (Facts, ¶ 8).

Moreover, Finish Line did not employ reasonable means to ensure the secrecy of the district manager list. First, the list was not marked CONFIDENTIAL. Second, Finish Line concedes that National Graphics, an outside vendor for Finish Line, was on the distribution list. (Fact, ¶ 10). Although there is no evidence that National Graphics actually received a copy of the list, a reasonable person would infer that Finish Line intended that it receive a copy. *Ecologix, Inc. v. Fansteel, Inc.*, 676 F.Supp. 1374, 1383 n.5 (N.D. Ill. 1988) ("[U]nrestricted disclosure to at least one third party on a completely non-confidential basis removes any indicia of secrecy for proprietary information to be considered a trade secret and defeats any claim founded upon misappropriation of such information.").

Further, Finish Line's list of district managers is readily ascertainable through proper means. The evidence reflects that at least twenty-five percent of Finish Line's district manager team used to work for Foot Locker, and thus, their identities are well-known to Foot Locker. (Facts, ¶ 4). In addition, these competitors have stores in the same malls throughout the country, and Foot Locker's district managers are acquainted with Finish Line's district managers. The contact information for these district managers is located in public directories. (Facts, ¶¶ 8-9). Therefore, the district manager list is not a trade secret. *Fleming Sales Co., Inc. v. Bailey*, 611 F.Supp. 507, 513 (N.D. Ill. 1985) (plaintiff's customer list was "readily ascertainable" since the customers were listed in public telephone directories and competitors "generally know who each other's customers are.").

21

## 2.     The Rolling Operating Forecast

As stated above, Mr. Morrison testified that he showed Mr. Mina a Finish Line ROF report which showed "a reprojection of [Finish Line's] business [as it relates to inventory] on an ongoing basis."  (Facts, ¶ 32).  The ROF report did not have any information regarding particular products or brands, or sales information on a local, district or regional level.  (Facts, ¶ 32).  While Finish Line claims that a competitor could use a ROF report to determine the "mark-up Finish Line received from its vendors," Finish Line concedes that the document does not reveal the mark-up of any particular product or brand.  (Facts, ¶ 36).  Also, although Finish Line claims that a competitor could use a ROF report to determine Finish Line's sales trends, or which product categories it intends to "ramp-up," it concedes that a competitor could not, using a ROF report, determine which particular products are selling successfully or where, or which products Finish Line intends to push or in which locations it intends to do so.  (Facts, ¶ 31).  Thus, the ROF report Mr. Morrison allegedly provided to Foot Locker does not have an independent economic value, and therefore, does not satisfy the statutory requirement of a trade secret.  Ind. Code § 24-2-3-2; *Applied Indus. Materials Corp. v. Brantjes*, 891 F.Supp. 432, 438 (N.D. Ill. 1994).

Even if the ROF report had an independent economic value, Finish Line cannot establish that it took reasonable steps to maintain its secrecy.  As with the district manager list, ROF reports are not even marked "CONFIDENTIAL," nor are the reports kept under lock.  (Facts, ¶ 33).  For these reasons, the court must **GRANT** Foot Locker's

motion for summary judgment on Finish Line's claim under the IUTSA.

### E.     Injunctive Relief

Given the fact that Finish Line cannot establish that the information Foot Locker obtained constituted confidential information, Finish Line is not entitled to injunctive relief.

### F.     Oral Argument

Foot Locker requests the court grant it oral argument on the instant motion for summary judgment.  As the court has found its motion to be meritorious, its request is **DENIED** as **MOOT**.

## IV.     Conclusion

For the reasons stated above, the court **GRANTS** Foot Locker's Motion for Summary Judgment and **DENIES** as **MOOT** its Motion for Oral Argument.

**SO ORDERED** this <u>18th</u> day of January 2006.

RICHARD L. YOUNG, JUDGE
United States District Court
Southern District of Indiana

Electronic Copies to:

Alan S. Brown
LOCKE REYNOLDS LLP
abrown@locke.com

John M. Callagy
KELLEY DRYE & WARREN LLP
jcallagy@kelleydrye.com

James Dimos
LOCKE REYNOLDS LLP
jdimos@locke.com

Spencer Patrick Goodson
BARNES & THORNBURG LLP
sgoodson@btlaw.com

Donald E. Knebel
BARNES & THORNBURG LLP
donald.knebel@btlaw.com

Dwight D. Lueck
BARNES & THORNBURG
dwight.lueck@btlaw.com

Deborah Pollack-Milgate
BARNES & THORNBURG
dmilgate@btlaw.com

Christine Loretta Schessler
KELLEY DRYE & WARREN LLP
cschessler@kelleydrye.com

Joel E. Tragesser
LOCKE REYNOLDS LLP
jtragesser@locke.com

David I. Zalman
KELLEY DRYE & WARREN LLP
dzalman@kelleydrye.com